## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **REYNALDO CRUZ,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**UNIÓN INDEPENDIENTE AUTÉNTICA DE LOS EMPLEADOS DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS; ET AL.,**<br><br>    **Defendants.** | **CIVIL NO. 17-2261 (PAD)** |

### OPINION AND ORDER

Delgado-Hernández, District Judge.

This is a challenge by an employee of the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), to the union-shop, maintenance-of-membership, and related fee-deduction provisions of the Puerto Rico Labor Relations Act, Law 130 of May 8, 1945, P.R. Laws Ann. tit. 29, §§ 61 et seq. ("Law 130") and of the collective bargaining agreement ("CBA") between PRASA and the Union Independiente Auténtica de los Empleados de la Autoridad de Acueductos y Alcantarillados ("UIA" or the "Union") (Docket No. 1). In addition, the employee complains that PRASA and UIA deducted and collected union fees from his wages in violation of the notice and procedural requirements outlined in Chi. Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson, 475 U.S. 292 (1986). Id. Along this line, he sued the Governor of Puerto Rico in his official capacity, PRASA, and UIA, seeking declaratory, injunctive, and monetary relief;

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 2

costs and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988; 28 U.S.C. §§ 2201 and 1920;

and Federal Rules of Civil Procedure 54(d) and 57 (Docket No. 1, pp. 21-23).[1]

Initially, defendants opposed the action but later in the litigation agreed that no employee

should be required to belong to the Union or subject his wages to withholdings for union dues

and fees in order to maintain employment with PRASA.   Further, PRASA stopped those

withholdings and UIA requested authorization to deposit —and deposited— with the court the

amount in union dues and fees that PRASA withheld from plaintiff's wages pursuant to the CBA

after he attempted to resign from the Union, and until the date that UIA accepted his resignation

and PRASA ceased deducting them, plus interest (Docket No. 231).   Considering these

developments, the case is moot.  Dismissal, however, will be without prejudice to allow plaintiff

to reopen the case in the event PRASA were to fall back into the situation that led plaintiff to

initiate this action.

## I.   PLEADINGS

### A.  Complaint

Plaintiff alleges that since 1992 he has been a PRASA employee required to maintain

union membership and subject his wages to deduction of union fees as a condition of

employment; in 2016, he resigned from the Union, but PRASA and UIA did not recognize the

resignation and continued deducting union dues and fees pursuant to Law 130 and the CBA

(Docket No. 1).  He asserts that: (1) Law 130 is unconstitutional in that it authorizes PRASA and

UIA to enter into "all-union" and "maintenance of membership" agreements and to subject the

---

[1]  The Governor is no more than a nominal party in this litigation.  Because of the Eleventh Amendment, damages may not be recovered from him.  In the event Hudson rights were violated, he would not be liable for or subject to any remedies over that violation.  And he has no role in the administration of the CBA.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 3

wages of non-consenting employees to withholdings for union dues; (2) various clauses in the CBA between PRASA and UIA are unconstitutional to the extent they include those requirements; and in the alternative, (3) PRASA and UIA failed to comply with Hudson, 475 U.S. at 292.  Id.  Also, he claims that public sector collective bargaining is inherently political and requests overruling of Abood v. Detroit Board of Education, 431 U.S. 209 (1977), which, among other things, upheld the constitutionality of the agency shop in the public sector.  Id.[2]

### B.  **Defendants' Response**

#### 1.  Governor

The Governor moved to dismiss, basically expressing that: (1) the Eleventh Amendment shields him from liability for damages in his official capacity; and (2) suing him is tantamount to "barking up the wrong tree," for he cannot afford plaintiff the remedy he is asking for (Docket No. 31, pp. 7-8).  Plaintiff countered that the Governor has the duty to faithfully execute the laws of Puerto Rico, and his presence is necessary to afford plaintiff a complete remedy (Docket No. 34).

#### 2.  UIA

UIA requested dismissal, pointing out that: (1) UIA is not a state actor; (2) Abood upheld agency shop agreements allowing every employee in the bargaining unit to pay a service fee to defray the costs of collective bargaining, contract administration, and grievance adjustment, albeit not to support ideological causes not germane to its duties as collective bargaining agent;

---

[2] The court construed this request as a call to bypass Abood.  At the end of the day, however, "only the [Supreme] Court "may overrule one of its precedents."  Panhorst v. U.S., 241 F.3d 367, 372 (4th Cir. 2001)(quoting Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 535 (1983)).  Still, as explained below, while this litigation was ongoing the issue came to a head in Janus v. AFSCME, 585 U.S. __, 138 S.Ct. 2448 (2018), which expressly overruled Abood.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 4

(3) plaintiff did not allege that UIA collected money from unit members to support ideological causes; (4) although collective bargaining might interfere with First Amendment rights, such interference as exists is constitutionally justified by the governmental interest in maintaining industrial peace and avoid free riding (Docket No. 43); (5) the Supreme Court has upheld the main holding of Abood several times; (6) PRASA operates as a private corporation and the National Labor Relations Act recognizes the validity of the union shop; and (7) Law 333 of September 16, 2004, P.R. Laws Ann. tit. 29, §§ 100 et seq. ("Law 333"), includes a Bill of Rights of Members of Organized Labor that complies with Hudson (Docket No. 43).

Plaintiff opposed the UIA's request, arguing that: (1) UIA and PRASA were acting under color of state law by requiring him to maintain union membership and pay union dues and fees as a condition of employment; (2) PRASA is a state actor and unions are state actors when they engage in joint activity with state actors, which occurred here when PRASA and UIA entered into the CBA; (3) Abood recognized that employees who refuse to associate with a union may constitutionally prevent the union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its dues and exclusive bargaining representative; yet, (5) First Amendment injury occurs when state actors compel support for speech and activity, not when the victim identifies specific political or ideological objection to First Amendment injury; (6) to be a union member here requires employees to swear loyalty to the union, and to attend meetings, pickets, marches, work stoppages or strikes if ordered, and if they fail to comply are subject to disciplinary measures, which infringe upon employee's rights; and, (7) closed shops are a prohibited form of compulsory association (Docket No. 46).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 5

Moreover, plaintiff expressed that: (1) <u>Abood</u> was wrongly decided because collective bargaining in the public sector is political speech indistinguishable from lobbying and has powerful political and civic consequences; (2) agency fee provisions impose a significant impingement on First Amendment rights, and to survive must serve a compelling state interest that cannot be served through means significantly less restrictive of associational freedoms, a test that the challenged provisions at issue in this case do not satisfy; and (3), whatever mechanism Puerto Rico might have established to protect union members rights under Law 333, UIA has an independent obligation to provide employees with those safeguards, and requiring plaintiff to litigate his <u>Hudson</u> claim with the state labor relations board to secure those rights would impose an unconstitutional condition on the First Amendment protections that he is owed a priori from the Union (Docket No. 46).

UIA replied, pointing out that: (1) it is not a state actor; (2) <u>Abood</u> permits public sector unions to collect fees geared towards defraying the costs of collective bargaining agreements, a decision justified by the need to maintain labor peace and avoiding free riders who would reap the benefits that employees obtain from the union's negotiating an agreement without contributing anything to the negotiations; (3) plaintiff failed to identify any instance of dues being used for  ideological spending not germane to UIA's duties as collective bargaining agent of PRASA's employees or instances where he was forced to participate in meetings, pickets, marches, work stoppages or strikes; (4) PRASA operates not as a public employer but as a corporation in a market, no PRASA employee is elected or directly responsible to the electorate, and as such, union members of the UIA are basically in the same position as private sector union

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 6

members in collective bargaining, which only indirectly affects, if at all, the electoral body; and (5) Law 333 satisfies <u>Hudson</u> concerns (Docket No. 52).

      3.  <u>PRASA</u>

PRASA did not move to dismiss.  Instead, it answered the complaint and cross-claimed against UIA (Docket No. 32).  As for the complaint, PRASA admitted some allegations and denied others.  <u>Id</u>.  In addition, it raised affirmative defenses, including that: (1) its actions were lawful within the purview of Law 130 and the CBA; (2) it was legally and contractually bound to comply with the UIA's dues checkoffs deductions; (3) it has no control over the amount of fees established by UIA or UIA's internal processes in dealing with bargaining unit employees' objections over union dues; and (4) it lacks authority over how union dues are allocated or spent. <u>Id</u>.

As for the cross claim, PRASA asserted that Article VII (5) the CBA includes a hold-harmless clause, which states: "The Union agrees to indemnify or exonerate PRASA for any amount of dues that PRASA deducted in compliance with this Article and that PRASA could be held liable to restitute to any employee or group of employees as a result of a judgment of decision that orders it as a result of a cause attributable to the Union."  <u>Id</u>.  Along this line, PRASA claimed that UIA is solely responsible for any and all remedies granted to plaintiff that could be imposed against PRASA in connection with plaintiff's union dues deduction by virtue of the CBA.  <u>Id</u>.  UIA moved to dismiss the crossclaim, arguing that inasmuch as the complaint upon which the crossclaim is contingent must be dismissed, so too must the crossclaim be dismissed (Docket No. 44).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 7

## II.   INTERVENING DECISION

While the motions to dismiss were pending, the Supreme Court decided Janus, 138 S.Ct. at 2448, invalidating agency fees in public sector collective bargaining.  As a result, the court issued a show cause order regarding the impact of Janus on this litigation (Docket Nos. 55). Defendants responded (Docket Nos. 64, 65, 70); plaintiff reacted to those filings (Docket Nos. 77, 78, 79); and UIA replied to the Governor's and PRASA's responses (Docket Nos. 76, 89). Additionally, the court heard arguments on pending motions (Docket No. 143).   After the hearing, it denied the motions to dismiss (Docket Nos. 91, 144, 145); the Governor and UIA answered the complaint (Docket Nos. 148, 149); and UIA answered PRASA's crossclaim (Docket No. 152).[3]

With the case past the pleadings stage, following discovery plaintiff moved for summary judgment (Docket Nos. 173).  PRASA and UIA opposed plaintiff's motion, moving for dismissal based on mootness (Docket Nos. 191 and 192), with which plaintiff took issue (Docket Nos. 204 and 205).   UIA replied (Docket No. 216).   Meanwhile, the court permitted the Office of Professional Employees of the Public Building Authority Union ("OPEPBAU"'), the State Insurance Fund Employees Union ("SIFEU"), and the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") to participate in the case as Amicus Curiae (Docket No. 143, p. 10).[4]

---

[3] In denying the Governor's motion to dismiss, the court should have clarified that the Governor would stay in the case as a nominal party.

[4] Like PRASA, the Public Building Authority and the State Insurance Fund are public corporations, that is, corporations owned or controlled by the Government of Puerto Rico.   See, P.R. Laws Ann. tit. 11, § 1b (State Insurance Fund); and P.R. Laws Ann. tit. 22, § 902 (Public Building Authority).  Hereinafter, OPEPBAU-SIFEU will be referred to as Amicus I; and AFL-CIO as Amicus II.  Originally, Amicus I requested intervention (Docket

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 8

## III.   DISCUSSION

### A.  Introduction

To understand why the case is moot, it is helpful to clarify what this case is not about.  It is not about the right of PRASA employees to organize; to engage in collective bargaining; to participate in concerted activities; or to strike (Docket No. 143, p. 53).  Instead, it deals with "union security" arrangements, a term that generally encompasses setups designed to bolster a union's membership and finances.  ROBERT A. GORMAN & MATTHEW W. FINKIN, BASIC TEXT ON LABOR LAW UNIONIZATION AND COLLECTIVE BARGAINING 900 (2nd ed. 2004).  These include:

1. The "closed shop," where an individual must be a member of the union in order to be eligible for hire and must retain membership as a condition of continued employment with the employer;

2. The "union shop," where an individual who is not a member of the union may be hired but within a specified time after hire must become and remain a member as a condition of continued employment with the employer;

3. The "maintenance of membership" clause, where an individual who is not a member of the union may be hired and retained but must remain a member until termination of the contract once having voluntarily become a member; and,

4. The "agency shop," where the individual who is not a member of the union may be hired and retained in employment without the necessity of becoming a member of the

---

No. 94), which the court granted (Docket No. 95).  Plaintiff asked for reconsideration (Docket No. 96); Amicus I opposed plaintiff's request (Docket No. 107); and the court went along with the motion for reconsideration but permitted Amicus I to participate in the case as Amicus (Docket No. 143, p. 10).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 9

union but must tender dues to the union as a condition of continued employment with the employer.[5]

As mentioned earlier, plaintiff impugns the constitutionality of: (1) the union shop, maintenance of membership, and union fee deduction provisions of Law 130, as supplemented by Law 99 of June 23, 1955; and (2) the conforming clauses of the CBA between PRASA and UIA. Along this line, Article 8(1)(c) of Law 130 authorizes employers and labor organizations to enter into "all-union" and "maintenance of membership agreements." P.R. Laws Ann. tit. 29, § 69(1)(c). Article 2(7) defines an "[a]ll union agreement" as an agreement between an employer and the representative of his employees in a collective bargaining unit whereby it is required as a condition of employment, that all employees in such unit be members of a single labor organization. Id. at § 63(7). Article 2(8) defines a "[m]aintenance of membership agreement" as the agreement between an employer and the representatives of his employees in a collective bargaining unit whereby it is required as a condition of employment, of all the employees who are members of the union at the time of the execution of the collective bargaining agreement or at other times thereafter, and under such other conditions as may be specified in the agreement, that they maintain themselves in good standing as members of the union during the life of the contract. Id. at § 63(8).

In turn, Article 8(1)(b) of Law 130 permits employers to deduct any sum of money from the salary, earnings or income of an employee for the payment of dues to a labor organization

---

[5] For a description and summary of union security arrangements, see, Luce & Co. v. Labor Relations Board, 71 P.R.R. 335, 340 (1950); David B. Gaebler, *Union Political Activity or Collective Bargaining? First Amendment Limitations on the Uses of Union Shop Funds*, 14 U.C. DAVIS L. REV. 591, n. 2 (1981); James M. Sullivan, *Freedom of Association and the Public Sector Agency Shop: Ball v. Detroit and Abood v. Detroit Board of Education*, 85 DICK. L. REV. 21 n. 1 (1980); GORMAN & FINKIN, supra, at 900-901.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 10

when such deduction is required by the terms of a collective bargaining agreement between the employer and a labor organization not established, maintained or supported by any action defined as an unfair labor practice, if such organization represents a majority of the employer's employees in an appropriate unit covered by such contract. Id. at § 69 (1)(b). Correspondingly, Article 4 of Law 99 allows employers to pay and deliver or to agree to pay or deliver money to employee representatives, and employee representatives are permitted to receive or accept or to agree to receive or accept money from an employer, "with respect to money deducted from the wages, salaries, remunerations, or incomes of employees for the payment of dues in a labor organization, provided such deduction is required by virtue of the terms of a collective bargaining agreement executed between the employer and a labor organization." Id. at § 84(4). The conforming contractual clauses are found in Articles VI (1), (2), (4) (5) and VII of the CBA.

### B. General Statutory Developments

Prior to 1934, there were no federal legislative limitations "on the right to bargain for union security." Charles E. Hopfi, *Agency Shop Question*, 49 CORNELL L. REV. 478, 479 (1964). In common law, "when courts typically enjoined strikes and picketing directed at objects believed by judges to be antisocial, injunctions frequently issued against concerted activities designed to coerce all employees to join the union or to coerce the employer to coerce in turn its employees to join the union." GORMAN & FINKIN, supra, at 898. In those settings, closed-shop arrangements were widely regarded as a proscribed subject. Id. The Great Depression and the advent of President Franklin D. Roosevelt's New Deal "spawned a political climate that was favorable to —or at least tolerant of— the growth of organized labor." I THE DEVELOPING LABOR LAW 24 (Patrick Hardin & John E. Higgins, Jr. eds., 2001).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 11

In 1933, Congress enacted the National Industrial Recovery Act. See, 48 Stat. 195 (1933). Section 7(a) "attempted to persuade industry to recognize employee rights to organize and bargain collectively, but the absence of any power to enforce these 'rights' rendered them virtually useless in the face of management's understandable hesitance to aid the growth of organized labor." THE DEVELOPING LABOR LAW, supra, at p. 25. In 1934, Congress "prohibited union shop agreements" in the railway sector subject to the Railway Labor Act, 45 U.S.C. §§ 151 et. seq. ("RLA"). Railway Emp. Dept. v. Hanson, 351 U.S. 225, 231 (1956).[6] At that point, the attitude of railway unions toward union security was rather ambivalent, for the union shop was being used by some employers to establish and maintain company unions. Id. Thence, just as no covered employer could contractually bind an employee not to join a union (the so-called yellow dog contract), no employer subject to the statute "could contractually require than an employee join." GORMAN & FINKIN, supra, at p. 898.[7]

In 1935, Congress enacted the National Labor Relations ("Wagner") Act to govern labor relations in the private sector other than in the railway industry regulated by the RLA. See, Pub. L. No. 198, 49 Stat. 449 (1935)(current version at 29 U.S.C. §§ 151-169). Expressing "concern for union stability in the face of employer coercion" (GORMAN & FINKIN, supra, at p. 898), Congress enacted § 8(3) of the Wagner Act, forbidding employers from encouraging or discouraging membership in any labor organization "by discrimination in regard to hire or tenure

---

[6] Congress enacted the RLA in 1926 to "promote stability in labor-management relations" in the railroad industry. Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994). In 1936, Congress extended the RLA to the then small-but-growing air transportation industry, except for a provision dealing with the National Railroad Adjustment Board. See, International Ass'n of Machinists, AFL-CIO v. Central Airlines, Inc., 372 U.S. 682, 958 (1963)(describing 1936 amendments to the RLA).

[7] See also, Int'l Ass'n of Machinists v. S. B. Street, 367 U.S. 740, 752-753 (1961)(describing congressional consideration of 1934 union security amendment to the RLA).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 12

or employment or any term or condition of employment."   29 U.S.C. § 158(a)(3).   And to preserve the negotiation and observance of union security agreements, Congress added that nothing in the provision or in any other statute of the United States, "shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein . . . if such labor organization is the representative of the employees . . . in the appropriate collective bargaining unit covered by such agreement when made."   Id.

With the addition of § 8(3), the Wagner Act covered "the closed and union shop, as well as less onerous union-security arrangements, if they were otherwise legal."   N.L.R.B. v. General Motors Corp., 373 U.S. 734, 739 (1963); Colgate-Palmolive-Peet Co. v. National Labor Relations Board, 338 U.S. 335, 361 (1949)("[T]here is no dispute as to the validity of the closed-shop contract as far as the [Wagner] Act is concerned"); Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 307 (1949)(§ 8(3) of the Wagner Act "disclaims a national policy hostile to the closed shop or other forms of union-security agreement").[8]   Thus, under the Wagner Act employers and qualified unions had "freedom to select any form of union security upon which they agreed."   Hopfi, supra, at p. 479.   Law 130 is modeled after the Wagner Act.   See, Confederación de Organizadores de Puerto Rico v. Servidores Públicos Unidos, 181 P.R. Dec. 299, 311, n. 9 (2011)(discussing inception of Law 130)(citing I DEMETRIO FERNÁNDEZ & CELINA ROMANY, DERECHO LABORAL: CASOS Y

---

[8] See also, Commc'ns Workers of Am. v. Beck, 487 U.S. 735, 747 (1988)(§ 8(3) of the Wagner Act "permitted majority unions to  negotiate 'closed shop' agreements requiring employers to hire only persons who were already union members").

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 13

MATERIALES 33 (1987)(noting that with some differences, the Wagner Act served as model for Law 130).[9]

Between 1935 and 1947, unions flourished to the point that in some industries, "four-fifths of the employees were working under collective bargaining agreements." THE DEVELOPING LABOR LAW, supra, at p. 35. Following World War II, a wave of strikes shut down steel mills, seaports, automobile assembly plants and other industries critical to the postwar conversion of the United States economy. Id. The disorderly state of industrial relations and resulting public indignation toward union activity created important issues for the midterm elections of 1946, which resulted in a shift of legislative majorities in both houses of Congress for the first time since 1930. Id. at 35-36. The shift led to a rethinking in policy, and to the enactment in 1947 of the Labor-Management Relations ("Taft-Hartley") Act, Pub. L. No. 80-101, 61 Stat. 136 (current version at 29 U.S.C. §§ 141-197).

With the Taft-Hartley Act, Congress re-lettered § 8(3) of the Wagner Act as § 8(a)(3), to specify that union security agreements could not require union membership as a condition of employment until "on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is later . . . ." 29 U.S.C. § 158(a)(3). In this way, Congress "outlawed the closed shop." Kenneth G. Dau-Schmidt, *Union Security Agreements under the National Labor Relations Act: The Statute, The Constitution, and the Court's Opinion in Beck*, 27 HARV. J. ON LEGS. 51, 59 (1990). Further, Congress restricted union discretion under union security agreements to the enforcement of the obligation to pay

---

[9] The correct citation, however, is to page 39.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 14

dues.  Id. at 60.  To boot, Congress adopted § 8(b)(2), to prohibit a union from causing or attempting to cause an employer to discriminate against an employee in violation of § 8(a)(3). Id.[10]

Into the bargain, Congress "intended to accomplish twin purposes." General Motors, 373 U.S. at 740-741.  First, to eliminate the most serious abuses of compulsory union membership by abolishing the close shop. Id.[11]  Second, to handle the "free rider" problem, as in the absence of a union security agreement, the non-union employees reap the benefits of union representation without sharing in its cost. Id.  So, the Taft-Hartley amendments ended up permitting voluntary agreements requiring such forms of compulsory membership as the union shop or maintenance of membership. Id. at 741.  But union membership as a condition of employment was whittled down to its financial core. Id. at 742.  Hence, union security agreements could not be used for any purpose "other than to compel payment of union dues and fees." Radio Officers' Union of Com. Telegraphers Union, A.F.L. v. N.L.R.B., 347 U.S. 17, 41 (1954).[12]  The Puerto Rico

_____

[10] Even though the Taft-Hartley Act is not limited to regulation of union security agreements, the full scope of the statute need not be considered here.

[11] By some accounts, prior to 1947, "unions abused closed shop agreements by arbitrarily preventing individuals from obtaining employment by refusing union membership, as well as causing workers to lose their jobs by expelling them from the union without justification."  Charles R. Virginia, Communications Workers v. Beck: Supreme Court Throws Unions Out on Street, 57 FORDHAM L. REV. 665, 669 n. 31 (1989).  Along the same line, Congress determined that "the closed shop and the abuses associated with it 'create[d] too great a barrier to free employment to be longer tolerated.'"  Beck, 487 U.S. at 748 (citing S.Rep. No. 105, 80th Cong. 1st Sess., 6 (1947)(S.Rep.), Legislative History of Labor Management Relations Act, 1947 (Committee Print complied for the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, p. 412 (1974)(Leg.Hist))(brackets in original).

[12] See also, Marquez v. Screen Actors Guld, Inc., 525 U.S. 33, 37 (1998)(noting that under § 8(a)(3) a union may negotiate a clause requiring membership in the union, but "an employee can satisfy the membership condition by paying to the union an amount equal to the union's initiation fees and dues"); GORMAN & FINKIN, supra at 899 ("The Taft-Hartley provisions of 1947 effectively limited union security in two ways: (1) the employer could hire persons other than union members (although they could be required to 'join' the union within thirty days) and thus deprive the union of control over the referral of job applicants; but (2) once hired, an employee need not, in order to

Reynaldo Cruz
v. <u>Unión Independiente Auténtica de los Empleados</u>
<u>de la Autoridad de Acueductos y Alcantarillados, et al.</u>
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 15

Legislature did not amend Law 130 to incorporate the Taft-Hartley amendments to the National

Labor Relations Act ("NLRA").

In the interval, employers and employees "were not always willing to give the unions

maintenance of membership or union shop agreements."  Hopfi, <u>supra</u>, at p. 479.  The unions

sought other arrangements which would be more palatable yet would provide the type of security

they wanted.  <u>Id</u>.  Such arrangement would not only have to be acceptable to both the employers

and the employees but would have to be legal.  <u>Id</u>.  The alternative was the agency shop, which

began to be used more frequently even though it had not been explicitly authorized by Congress.

<u>Id</u>. at pp. 479, 488.  Still, the Supreme Court validated the arrangement, which is less intrusive

on employees than other modalities of union security agreements, noting that it "places the

option of membership in the employee while still requiring the same monetary support as does

the union shop," and as such, serves "the desire of Congress to reduce the evils of compulsory

unionism while allowing financial support for the bargaining unit."  <u>General Motors</u>, 373 U.S. at

744.[13]

---

retain his or her job, attend union meetings, refrain from criticizing union leadership and otherwise maintain good standing in the union, but need merely 'tender the periodic dues and initiation fees uniformly required' of union members").

[13] In <u>General Motors</u>, 373 U.S. 734, the employer refused to bargain with the union over an agency shop arrangement, arguing that because the agency shop does not require membership, it was not allowed under Section 8(a)(3) of the Taft-Hartley Act.  <u>Id</u>. at 741-742.  The Supreme Court found nothing in the provision's legislative history indicating that Congress intended to validate only the union shop and simultaneously to abolish in addition to the closed shop, all other union-security agreements permissible under state law.  <u>Id</u>. at 741.  So, it held that, as the Taft-Hartley amendments had whittled the term "membership" down to its financial core of merely the obligation to pay dues, the agency shop served Congressional objectives, and accordingly sustained the National Labor Relations Board's decision ordering the employer to bargain with the union over the agency shop agreement.  <u>Id</u>. at 736-738, 740-745.  Neither the abuses at which those amendments were aimed, nor the solution devised by Congress "were related to the agency shop or the obligation to pay dues."  Dau-Schmidt, <u>supra</u>, at p. 23.  As with other legislative enactments, congressional action reflected a compromise, one between those in Congress who opposed union security agreements and those who wanted no restraints on such agreements.  <u>Id</u>. at 21.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 16

In 1951, Congress modified § 2 Eleventh of the RLA to make it very similar to § 8(a)(3) of the NLRA, as amended by the Taft-Hartley Act, except that § 2 Eleventh explicitly preempts contrary state laws.  See, 45 U.S.C. § 152 Eleventh.   As mentioned earlier, prior to the amendment the RLA "prohibited union shop agreements."  Hanson, 351 U.S. at 231.  Thus, with the 1951 amendment, Congress provided for the same sort of union security agreements under § 2 Eleventh "as it had permitted under [§] 8(a)(3) of the NLRA."  Dau-Schmidt, supra, at 6.

### C.  Caselaw

The statutory constructions of both § 8(a)(3) and § 2 Eleventh "sparked disputes between nonunion employees and their employers," leading to litigation to determine the extent and constitutionality of union security agreements under those provisions.  Dau-Schmidt, supra, at 6. The test came first in Hanson, 351 U.S. at 225.  There, non-union railroad employees sued their employer and labor organizations representing various groups of railroad employees in state court to enjoin application and enforcement of a union shop agreement entered into pursuant to the RLA.  Id. at 227.  The state supreme court held that the union shop agreement violated the First Amendment in that it deprived the employees of their freedom of association and violated the Fifth Amendment to the extent it required members to pay for things beyond the cost of collective bargaining, and there was no valid federal law to supersede the right to work provision of the state constitution.  Id. at 717.  The Supreme Court reversed the state supreme court.

First, the Supreme Court observed that the union shop provision negotiated by the employer and the unions in an agreement made pursuant to the RLA had the imprimatur of federal law, and by the force of the Supremacy Clause could not be made illegal by any provision of state law.  Id. at 232.  Second, as for the right to work included in the concept of

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 17

liberty within the meaning of the Due Process Clause, the Court pointed out that trade unionism strengthened that right, and Congress could validly believe that financial support for the union would help ensure the right to work in and along the arteries of interstate commerce. Id. at 234-235. Third, the Court noted that Congress endeavored to safeguard against the possibility that compulsory union membership would be used to impair freedom of expression by making it explicit that no conditions to membership may be imposed except with respect to initiation fees, periodic dues, and assessments, which the Court found acceptable, so long as those items were imposed for purposes germane to collective bargaining. Id. at 238. Fourth, on the record before it, the Court found no infringement of First Amendment rights. Id. However, the Court warned that its decision would not prevent a different finding in a future case if dues, fees, or assessments were used as a cover for forcing ideological conformity or other action in contravention of the First Amendment. Id. To conclude, the Court held that the requirement of financial support for the collective bargaining agency by all who received the benefits of the agency's work was within the power of Congress under the Commerce Clause and did not violate either the First or Fifth Amendments. Id.[14]

Five years later, in Street, 367 U.S. at 740, the Supreme Court considered another case in which workers objected to a union security clause. In that case, plaintiffs challenged in state court the constitutionality of an agency shop agreement negotiated under § 2 Eleventh of the

---

[14] In Harris v. Quinn, 573 U.S. 616 (2014), the Supreme Court characterized Hanson's First Amendment analysis as "thin," and the resulting First Amendment holding as "narrow." Id. at 631. It noted that "all that was held in Hanson was that [the RLA] was constitutional in its *bare authorization* of union-shop contracts requiring workers to give 'financial support' to unions legally authorized to act as their collective bargaining agents," and that the Court did not suggest that 'industrial peace' could justify a law that 'forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought,' or a law that forces a person to 'conform to [a union's] ideology.'" Id. at 631 (citation omitted; brackets and italics in original).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 18

RLA, complaining that the money each was compelled to pay to hold his job was in substantial part used to finance the campaigns of candidates for federal and state offices whom the plaintiffs opposed, and to promote the propagation of political and economic doctrines, concepts, and ideologies with which they disagreed.  Id. at 742-744.  The trial court found that the union had spent a portion of the money it had collected in fees on political activities and entered a judgment and decree enjoining the enforcement of the clause on the ground that § 2 Eleventh violated the Federal Constitution to the extent it permitted such use by the union of the fund exacted from the employees.  Id. at 744-745.  The state supreme court affirmed the trial court.  Id. at 745.  The Supreme Court, however, reversed, recognizing that the case presented constitutional questions "of the utmost gravity."  Id. at 749.  But the Court found it unnecessary to reach those questions. Id. at 750.  Instead, it construed § 2 Eleventh to allow the compulsion of dues for collective bargaining but not for political purposes.  Id. at 768-769.  For the Court, this approach eliminated free riders, without vesting the unions with unlimited power to spend exacted money.  Id. at 768.

Next, in Railway Clerks v. Allen, 373 U.S. 113 (1963), the Supreme Court reaffirmed this approach under § 2 Eleventh, describing union expenditures that could fairly be charged to all employees in the bargaining unit as those "germane to collective bargaining."  Id. at 121. Then, in Ellis v. Brotherhood of Railroad, Airline and Steamship Clerks, 466 U.S. 435 (1984), the Court refined this holding, interpreting § 2 Eleventh to allow compulsion of dues to cover expenditures necessarily or reasonably incurred by the union for "the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues."  Id. at 448.  Subsequently, in Beck, 487 U.S. at 735, the Court interpreted § 8(a)(3) of the NLRA "in the same manner" as it had construed § 2 Eleventh of the RLA on the

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 19

use of compulsory dues to cover union expenditures.  Id. at 752, 762-763.  By finding a statutory limit on union expenditures, however, "the Court avoided addressing possible limits imposed by the Constitution and by the duty of fair representation."  Virginia, supra, at p. 666.

Nevertheless, the constitutional issue was unavoidably presented in Abood, 431 U.S. at 209.  There, the Supreme Court held that under the First Amendment, a public employer may require non-union members in a bargaining unit to pay fees to the union for costs incurred in the collective bargaining process, but not to contribute to the union's political and ideological projects.  Id. at 224-225.  The Court observed that compelling employees to financially support their collective bargaining representative impacted their First Amendment interests (id., at 222), but that the desirability of labor peace and the prevention of free riding justified authorization of the agency shop in public employment.  Id. at 224-225.[15]

Over the years, the Supreme Court "cited Abood favorably numerous times."  Harris, 573 U.S. at 669 (Kagan, J. dissenting).  But in 2012 the Court decided Knox v. Serv. Emps. Int'l Union, Loc. 1000, 567 U.S. 298 (2012), observing that Abood's "[a]cceptance of the free-rider argument as a justification for compelling non-members to pay a portion of union dues" represented something of an anomaly, given that such free-rider arguments "are generally insufficient to overcome First Amendment objections."  Id. at 311.  Moreover, in discussing the agency-shop, the Court pointed out that compulsory subsidies for private speech are subject to

---

[15] By "labor peace," the Abood Court meant avoidance of the conflict and disruption that it envisioned would occur if the employees in a unit were represented by more than one union.  See, 431 U.S. at 220-221 (describing concept). In such a situation, the Court predicted, inter-union rivalries would foster dissension within the work force, and the employer could face conflicting demands from different unions.  Id.  Confusion would ensue if the employer entered into and attempted to enforce two or more agreements, specifying different terms and conditions of employment.  Id. And a settlement with one union would be subject to attack from a rival labor organization.  Id.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 20

"exacting First Amendment scrutiny" (id., at 310), a level of scrutiny that Abood did not apply.

See, Abood, 431 U.S. at 245 (Powell, J., concurring in judgment).

In 2014 the Supreme Court expressed in Harris, 573 U.S. at 636, that Abood fundamentally misunderstood earlier cases concerning laws authorizing compulsory fees in the private sector; failed to appreciate the difference between the core union speech involuntarily subsidized by dissenting public-sector employees and the core union speech involuntarily funded by their counterparts in the private sector; failed to appreciate the difficulty of distinguishing between collective bargaining and politics in the public sector; did not anticipate the magnitude and practical administrative problems that would result in attempting to classify public-sector union expenditures as either chargeable or nonchargeable; did not foresee the practical problems that would face objecting nonmembers; and wrongfully assumed that a union or agency shop is necessary to exclusive representation. Id. at 635-638. Still, the Court stopped short of overruling Abood because it was not necessary to resolve the issue in Harris, which was whether the First Amendment permits a State to compel personal care providers who were not full-fledged public employees, to subsidize speech on matters of public concern by a union that they did not wish to join or support. Id. at 620-622, 645 n. 19.[16]

In 2015, the Supreme Court granted certiorari in Friedrichs v. Cal. Tchrs. Ass'n, 578 U.S. 1 (2016), to resolve the question of "whether Abood . . . should be overruled and public-sector 'agency shop' arrangements invalidated under the First Amendment." Petition for Cert. at (i), Friedrichs, 2015 WL 393856 (Jan. 26, 2015). After the passing of Justice Scalia, the Court split

---

[16] Plaintiffs were not considered full-fledged public employees because even though the State paid for their services, the State's customers were responsible for controlling all aspects of their employment relationship. See, Harris, 573 U.S. at 620-622 (describing customers' employer status),

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 21

4-4 on this question.  See, Friedrichs, 578 U.S. at 1.  And at this crossroads, the Court decided Janus, overruling Abood.  See, Janus, 138 S.Ct. at 2486 (stating it so).  In Janus, the Court dealt with a state law requiring non-union, public-sector employees in the bargaining unit to pay, consistent with Abood, fees to the union for costs incurred in the collective bargaining process. Id. at 2478.  All the same, the Court referred to Abood as an "anomaly" in First Amendment jurisprudence (id., at 2483); noted that it was "not well reasoned" (id., at 2481); found it "unworkable" (id. at 2486); and considered it as an "outlier" in First Amendment cases (id., at 2482).  Correspondingly, the Court held that public sector agency shop arrangements violate the First Amendment; states and public sector unions may no longer deduct or collect agency fees from nonconsenting employees; and neither an agency fee nor any other payment to the union may be deducted or collected from a non-member's wages unless the employee affirmatively consents to pay.  Id. at 2478, 2486.  Most important, the Court's reasoning reflects the interplay of separate but correlated premises.

First, public employees are entitled to the protection of the First Amendment, which is significantly impinged when these employees are required to pay agency fees to financially support a union that takes positions during collective bargaining that have "powerful political and civic consequences," including positions on how money is managed, which impacts a government unit's budget and capacity to provide services to the public.  Janus, 138 S.Ct. at 2464.  As such, it bestows political valence upon public-sector collective bargaining, turning it into inherently political speech.  Id. at 2480, 2483.[17]  And the First Amendment does not permit

---

[17] Among the variables bearing on this subject, the Supreme Court mentioned wages, holiday and overtime pay, promotion policies, financing of pensions and health insurance, as well as issues surrounding tenure, discipline, dismissals, and handling of grievances, all of which influence how money is spent.  See, Janus, 138 S.Ct. at 2474-

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 22

the government to force a public employee to pay for that speech, even if the government thinks that the speech promotes the interests of the employee who does not wish to pay.  Id. at 2467.

Second, neither "labor peace" nor the worth of preventing "free riders" justifies forcing payment of agency fees on nonconsenting public employees.  Janus, 138 S.Ct. at 2465-2466.  Labor peace may serve as a compelling state interest but may be achieved through means significantly less restrictive of first amendment freedoms than the assessment of agency fees.  Id.  Designation of a union as the exclusive representative of all employees in a unit is not dependent on a union or agency shop.  Id. at 2465, 2480, 2483.  In addition, avoiding free riding is not a compelling interest.  Id. at 2466.  As such, it is generally insufficient to overcome first amendment constraints, and has led to problems of its own.  Id.

To accommodate the goal of counteracting free riding with the First Amendment interests of employees compelled to financially support a union, Abood relied on a line between chargeable union expenditures (that is, expenditures for collective-bargaining, contract administration, and grievance adjustment purposes), and nonchargeable union expenditures (i.e., expenditures for political or ideological purposes).  See, Abood, 431 U.S. at 232-236 (discussing topic).  That line, however, has proved "impossible to draw with precision," suffering from a degree of "vagueness" that sometimes allows what it should not allow.  Janus, 138 S.Ct. at 2481.  In addition, Abood did not foresee the practical problems that would face objecting nonmembers

---

2477 (noting items).  In turn, these items draw attention to sources of funding and may lead to shortfalls and unsustainable collective bargaining agreements that have been blamed for municipal bankruptcies.  Id. at 2483.  From this perspective, union speech in collective bargaining is not a matter of only private interest but of overwhelmingly public concern.  Id. at 2477.  Along with affecting how public money is spent, the Court recognized that union speech in collective bargaining also addresses other matters of public importance, including minority rights, education, and child welfare.  Id. at 2475.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 23

in trying to understand the validity of a union fee.  Id. at 2480-2482.  While unions must provide nonmembers with sufficient information to gauge the propriety of that fee, it has proven difficult for them to determine whether the figures that unions come up with are even close to the mark without retaining the services of attorneys and accountants.  Id. at 2482.  And even with those services, the evaluation of union-provided figures is difficult and laborious.  Id.

Third, considering this landscape, union fees cannot be extracted from "nonconsenting" public sector employees.  Janus, 138 S.Ct. at 2481.  Neither an agency fee nor any other payment to a union may be deducted from a nonmember's wages, nor may any attempt be made to collect such a payment unless the employee consents to pay.  Id.  Consent, however, cannot be presumed.  Id.  To the effective, it must be freely given and shown by clear and compelling evidence.  Id.  Thus, the employee must clearly and affirmatively consent to pay those fees.  Id.

**D.  Parties' Response to Janus**

### 1.   GOVERNOR

The Governor pointed out that under Janus, a public employee who does not wish to join a union or who wishes to no longer be a union member has a right to do so and cannot be required to pay any dues to the union (Docket No. 64, p. 8).  Thus, he acknowledged that the challenged provisions of Law 130 are unconstitutional, and the remedies that plaintiff has requested should be granted.  Id.

### 2.   PRASA

PRASA stated that although the situation in Janus is distinguishable from the situation in this case, it would follow the Puerto Rico Secretary of Justice's lead and prospectively abide by Janus (Docket No. 70, pp. 8-11).  To justify this position, PRASA asserted that it had the

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 24

obligation to comply with Law 130, which at the time plaintiff initiated this action, was in full

force and effect and, to PRASA's knowledge, had not been judicially questioned.  Id. at 8.  From

this perspective, it noted that under Law 130 plaintiff has no right to request unenrollment from

the Union because as negotiated in the CBA pursuant to Law 130, being a member of the Union

is a requirement for employment with PRASA.  Id. at 6-8.  PRASA explained that is why it had

to withhold union dues from plaintiff's wages and remit those dues to UIA.  Id.[18]  For PRASA,

Janus does not expressly address these prescripts, as it assumed that public sector employees

have the right to request unenrollment from unions as allowed under Illinois Labor Relations

Act.  Id. at 8.  Hence, in PRASA's view, the controversy in Janus was simpler than the one here.

Id. at 6.

At the same time, PRASA mentioned that in the wake of Janus, the Puerto Rico Secretary

of Justice issued an Opinion concluding that the challenged provisions violate the free speech

rights of public sector employees by allowing labor organizations to negotiate all union and

maintenance of membership agreements, and that negotiation of those agreements with

government corporations is impermissible under Janus as an infringement of the employees'

freedom of speech and association (Docket No. 70, p. 9).  Further, the Secretary of Justice

explained that as a direct consequence of Janus, union shop clauses in collective bargaining

agreements with government corporations such as PRASA are null, and that any deduction from

an employee's salary to pay dues to a union must be expressly authorized by the employee, as

---

[18] Relatedly, PRASA argued that it had acted in good faith (Docket Nos. 190, p. 10; 70, p. 8).  Plaintiff took issue
with this proposition, arguing that PRASA acted in bad faith, blatantly disregarding his requests after he confronted
it with the unconstitutionality of Law 130, the CBA's conforming provisions, and PRASA's practices (Docket No.
204, p. 4).  Additionally, he asserted that good faith compliance with an overruled law is not a cognizable defense
under 42 U.S.C. § 1983, and that state actors who deprive persons of their constitutional rights are liable for
enforcing unconstitutional laws even when following faulty precedent.  Id. at 7-8.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 25

otherwise, the employer would be infringing upon the employee's constitutional right to freedom of speech.  Id. at 9-10.[19]

On this basis, PRASA had no objection to entry of a prospective declaratory judgment as the one entered in Janus regarding the unconstitutionality of the statutory and contractual provisions in question (Docket No. 70, p. 10-11).  Even more, it stated to have discontinued deducting union fees from plaintiff and nonconsenting employees.  Id. at 11.  That said, it objected to plaintiff's request for restitution of all union dues paid from the date that he resigned from the Union plus interest and damages.  Id.  In the alternative, however, it submitted that UIA would be liable for them.  Id.

3.   UIA

For UIA, Law 130 does not fall under the aegis of Janus but under that of Hanson, 351 U.S at 225; Street, 367 U.S. at 740; and Allen, 373 U.S. at 113 (Docket No. 65, pp. 13-17).  This, because Law 130 applies not to the central or municipal governments, but to private-sector entities and government corporations and instrumentalities that operate as private businesses.  Id. In UIA's view, that is the case with PRASA, which, it claims, must be considered a private employer rather than a public sector employer within the scope of Janus (Docket Nos. 76, pp. 7-8; 89, p. 3).

To this end, UIA pointed out that PRASA is organized and operates as a private corporation funded by its own activities, with a budget derived from its income (Docket Nos. 65, pp. 6, 24; 89, p. 10).  Besides, it has the capacity to sue and be sued; to enter into contracts; to

---

[19] In the same manner, in July 2018, the Puerto Rico Secretary of Labor and Human Resources and the Director of the Office for the Administration and Transformation of Human Resources of the Government of Puerto Rico issued Special Joint Memoranda (Nos. 2018-01 and 2018-02), laying out the policies and procedures to enforce Janus for employees of all public sector agencies and government corporations in Puerto Rico.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 26

purchase and dispose of property, over which it has complete dominion; to borrow money; and to issue bonds for any of its corporate purposes (Docket No. 76, p. 5).  As well, none of PRASA's employees is elected or directly responsible to the electorate, and its obligations are exclusively its own and do not bound the government of Puerto Rico (Docket No. 65, pp. 6-8).  Those obligations are paid for with PRASA's funds (Docket No. 89, p. 11).  And those funds are not part of the operating funds of the government of Puerto Rico (Docket Nos. 65, p. 9; 89, p. 11).  Rather, they remain under PRASA's control and are deposited in accounts under PRASA's name.  Id.  Over and above, PRASA does not have the power to levy taxes or pledge the credit of Puerto Rico (Docket No. 65, p. 7).

According to UIA, PRASA's focus is on profitability as a corporate entity operating in a market (Docket Nos. 65, p. 6; 76, p. 7).  PRASA charges for the services it renders and because it deals with revenue bonds, it must collect their total value to allow, as in the case of a similar private financing, the adequate payment of the debt (Docket No. 76, p. 5).  The wages, benefits, and pensions that it pays to union members do not originate in Puerto Rico government coffers, and do not have the same political valence as the ones that the Supreme Court expressed concern about (Docket No. 65, p. 9).  To UIA's way of thinking, the fact that unsustainable collective bargaining agreements could lead to bankruptcy, rings hollow in the case of PRASA (Docket No. 89, p. 11).

Furthermore, UIA observed that in light of PRASA's characteristics, the entity's employees cannot be properly considered public sector employees (Docket No. 65, p. 5).  It noted that consistent with this feature, PRASA's employees are not subject to the Personnel Law of the Commonwealth of Puerto Rico, which differentiates them from their counterparts in the

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 27

central government, whose labor grievances are heard by the Commonwealth's Public Service Labor Commission, as opposed to those of PRASA's employees and employees of other government corporations that operate as private businesses, which are heard by the Labor Relations Board of Puerto Rico (Docket Nos. 65, pp. 9-12; 89, p. 6). Along the same line, it mentioned that unlike with central government employees, §§ 17 and 18 of Article II of the Constitution of Puerto Rico grant government corporation employees the right to organize; to engage in collective bargaining; to participate in concerted activities; and to strike (Docket No. 76, pp. 5-6).[20]

UIA argued that based on these elements, it cannot be regarded as a public-sector union (Docket No. 65, p. 2). It posited that, by extension, its relationship with PRASA is the same as that of any union with a private employer, and that its members are basically in the same position as the private sector union members of unions engaged in collective bargaining. Id. at 6. Thus, it asserted that collective bargaining with PRASA cannot be considered political speech any more than collective bargaining between a union and a company in the private sector can be considered political speech. Id. at 5. As such, it claimed that collective bargaining here does not unduly infringe upon the First Amendment rights of PRASA employees. Id. at 2-5, 24. From UIA's frame of reference, applying Janus to PRASA's employees would be unwarranted and short sighted; declaring Law 130 unconstitutional under Janus would be tantamount to declaring similar dispositions of the NLRA unconstitutional; and the Puerto Rico Secretary of Justice's opinion should be rejected as faulty (Docket Nos. 76, pp. 5-7; 89, p. 2).

---

[20] Contrary to UIA, PRASA acknowledged that government corporations' employees are considered public employees (Docket No. 70, p. 1, n. 1).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 28

Finally, UIA brought forth the fact that Law 130 is modeled after the Wagner Act, which recognized the legality of the closed and agency shop (Docket No. 76, pp. 12-13).  For UIA, that was the policy choice that the Puerto Rico Legislature made, and it is a choice that should not be questioned by this court.  Id. at 13.[21]  UIA, however, expressed that if the court found Janus controlling, Janus only requires public employers to prospectively abstain from deducting union fees from a nonmember's wages without the employee's affirmative consent (Docket No. 65, p. 23).  And it reasoned that this should end the matter, simply barring PRASA from deducting agency fees from nonconsenting nonmembers but leaving intact exclusive representation and other items such as PRASA's agreement with UIA to deduct dues from union members' wages. Id. at 22-24.

4.      AMICUS I

Amicus I alleged that Janus does not apply here, because in Janus the plaintiff was employed by a state government agency, whereas plaintiff is employed by a corporation of the Government of Puerto Rico that operates as a private business (Docket No. 108, pp. 2-3).  In this connection, Amicus I observed that government corporations like PRASA function as private companies that provide goods and/or services to generate their own revenue, which is kept separate from that of the government of Puerto Rico; their officers are not elected officials and are not subject to confirmation by the legislative branch even though they are appointed by the executive branch; their management is not directly accountable to the electorate; they do not

---

[21] In addition, UIA stated that, as in the private sector, PRASA and UIA may negotiate agency shop provisions (Docket No. 65, pp. 15-16, 18).  As plaintiff, however, observed, the contested provisions are not "agency shop" clauses where employees can refrain from joining a union and instead be required to pay union service fees as a condition of employment (Docket No. 77, p. 13).  Instead, they require full-fledged union membership and payment of fees as a condition of employment.  Id.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 29

make public policy determinations that correspond to the executive and legislative branches of government; as opposed to public agencies, they pursue profit in order to provide their corresponding services to the public; and may issue bonds that are independent from those of the Commonwealth of Puerto Rico.  Id. at 6.  So, for Amicus I, decisions undertaken in collective bargaining do not have any important or crucial political or civic consequences.  Id.  Likewise, it claimed that there is no risk that unions may use the dues to promote public policy or political interests or pursuits.  Id. at 5.

As for why the compulsory union membership and fee-paying requirements are appropriate, Amicus I indicated that because government corporations provide essential services to the public, Puerto Rico has a compelling interest in preventing labor strife, an interest which, in its view, goes beyond that of guaranteeing labor peace by avoiding competition among labor unions (Docket No. 108, pp. 5, 7).  This, in Amicus I's view, to safeguard a labor relations scheme in which unions are granted the right to exclusive representations; the employees' constitutional right to strike is accounted for; and all employees in the unit contribute to fund the collective bargaining process.  Id. at 5.  In addition, Amicus I expressed that contrary to the situation in Illinois, Law 333 provides to government corporation employees covered by a collective bargaining agreement, with safeguards and concrete procedural mechanisms to protect transparency and compel unions to be open in the use of funds received from fees, allowing employees to police, investigate, and sanction malfeasance in the use of those funds.  Id. at 8.  In consequence, for Amicus I, these elements justify maintaining the existing statutory scheme, for it duly takes care of plaintiff's constitutional claims, properly balancing all interests at stake.  Id. at 9.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 30

5.      AMICUS II

Amicus II argued that the present case differs in meaningful ways from Janus, which according to Amicus II, does not apply here (Docket No. 128, p. 5).  To this end, it observed that Janus involved a collective bargaining agreement negotiated pursuant to a state law where, consistent with Abood, employees who declined to join the union could instead pay an agency fee amounting to a percentage of union dues.  Id.  Janus, however, went further than Abood, holding that requiring a public employee to pay even an agency fee as a condition of employment violates the free speech rights of non-members.  Id. at 4-5.  So, from Amicus II's viewpoint, Janus did not deal with a statute like Law 130, which requires a public employee to join a union as a condition of employment.  Id. at 5-6

6.      PLAINTIFF

First, plaintiff pointed out that government corporations are public employers within the meaning of the First Amendment and persons acting under color of state law under 42 U.S.C. § 1983 (Docket Nos. 77, p. 3; 112, p. 6).  As for PRASA, he noted that it is a government-run monopoly entrusted with and carrying out the important government function of providing and helping to provide to the citizenry adequate water, sanitary sewage, and other services or facilities proper and incidental therefor (Docket No. 77, p. 5).  Along this line, PRASA was created by a legislative act and is overseen by a board of directors, the majority of whom are appointed by the Governor with the advice and consent of Puerto Rico's Senate and subject to removal proceedings at the instance of the Governor.  Id. at 4.  Further, Puerto Rico's Legislature delegated to PRASA the power of eminent domain and the power to enact rules and regulations regarding the use and conservation of water and the disposal of sewage, all of which have the

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 31

force of law.  Id. at 4-5.  Similarly, PRASA's contracts with aqueduct systems in Puerto Rico are subject to the approval of the Governor and the Legislature, and its property, income, bonds, obligations, and activities are exempt from taxation.  Id. at 5.  Plaintiff added that, in this setting, PRASA's separation of budget and finances from the central government is of no consequence to its status as a public employer.  Id. at 6.  Correspondingly, he asserted that like the employees of other government corporations, PRASA's employees are public employees entitled to the protection of the First Amendment and, that being the case, PRASA cannot curtail his freedoms of speech and association (Docket No. 112. pp. 13-15).

Second, plaintiff complained that despite this constitutional prohibition, he was forced not only to pay union fees as a condition of employment, but also to be a full-fledged union member (Docket No. 112, p. 13).  On these elements, he indicated that collective bargaining in government corporations that perform essential government services like PRASA has powerful political and civic consequences to the government and citizens, for it revolves around budgetary issues and the performance of government services to the people (Docket No. 77, p. 6).  Hence, it has political valence, touching on key items like the cost of employees' wages, benefits, and pensions, and on how much PRASA raises and allocates money among those items, and between operations and infrastructure, which impacts how much PRASA charges to the public, its credit rating and financial stability or solvency.  Id. at 7.  In consequence, plaintiff claimed that under Janus he cannot be forced to pay agency fees and, by extension, be compelled to be a full-fledged union member, which is far more restrictive of First Amendment freedoms than the act of simply requiring payment of agency fees (Docket Nos. 77, p. 11; 112, pp. 13-14).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 32

Third, from plaintiff's standpoint, there is no justification for these burdens, which cannot stand unless they survive exacting scrutiny (Docket No. 112, p. 9).  In other words, they must serve a compelling state interest achieved through means significantly less restrictive of associational freedoms than are present here.  Id.  Along this line, plaintiff asserted there has been no showing that forced union membership and union fee deductions serve a compelling state interest.  Id.  He reasoned that as the Supreme Court did in Janus, the court may assume that labor peace is a compelling interest, but as the Court concluded in Janus, that justification falls apart because it is predicated on unfounded fears of confusion, disruption, and dissension in the work force.  Id. at 10-11.  Likewise, he stated that rebranding labor peace as the need to prevent labor strife does not explain why forcing public sector employees to become full-fledged union members and pay union dues is necessary to accomplish that objective.  Id.[22]  In the same vein, he argued that guaranteeing unions' ability to obtain non-members' reasonable contribution of union dues merely resurrects the free rider rationale that Janus rejected.  Id. at 12.  And he contended that the forced membership and fee payment requirements of Law 130 are nowhere near being the least restrictive means for achieving whatever compelling state interests Puerto Rico might have on this matter.  Id. at 12, 14.  For him, forcing nonmembers to pay fees was the last vestige of union membership requirements "now swept away into obsolescence" by Janus (Docket No. 77, p. 12).

---

[22] Plaintiff highlighted that no one in this case has explained how "labor strife" is distinct from "labor peace" or shown that it raises any distinct concerns, and that whatever the "labor strife" context of "labor peace" might be, there has been no spelling out of how forcing public sector employees to become full-fledged union members or pay union fees is even related to employees' right to strike or otherwise preventing "labor strife."  Id. at 11.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 33

### E. **Motion for Summary Judgment**

After discovery, plaintiff moved for summary judgment, basically relying on the arguments he had advanced in previous stages of the litigation (Docket No. 173). PRASA responded, noting in part that because it stopped requiring employees to be part of a union as a condition of employment, the action is moot as to it and should be accordingly dismissed (Docket No. 190, p. 12). UIA asked for dismissal on mootness grounds (Docket No. 191, p. 2). Plaintiff opposed PRASA's and UIA's requests (Docket Nos. 204 and 205).

### F. **Mootness**

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2. The doctrine of mootness enforces the mandate that "an actual controversy must be extant at all states of the review, not merely at the time the complaint is filed." Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003). If events have transpired "to render a court opinion merely advisory, Article III considerations require dismissal of the case." Am. Civ. Liberties Union of Mass. v. U.S. Conference of Bishops, 705 F.3d 44, 52-53 (1st Cir. 2012). Moreover, when the issues presented "are no longer live or when the parties lack a legally cognizable interest in the outcome . . . a case or controversy ceases to exist, and dismissal of the action is compulsory." Libertarian Party of N.H. v. Gardner, 638 F.3d 6, 12 (1st Cir. 2011). The party raising a mootness defense "has the burden of establishing the facts necessary to sustain that defense." Ramírez v. Sánchez-Ramos, 438 F.3d 92, 100 (1st Cir. 2006). To satisfy this burden, the challenger must show that, after the case's commencement, intervening events have blotted out the alleged injury and established that the conduct complained of cannot reasonably be expected to recur. Id. If it is sufficiently plain that

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 34

intervening events have wiped the slate clean, the case has become moot.  Id.  Such is the case here.

First, it is undisputed that: (1) in July 2018, UIA accepted plaintiff's resignation from the union; (ii) since then, union dues and fees have not been deducted from his pay; and (iii) he has remained employed with PRASA (Docket No. 192, p. 6).  Neither PRASA nor UIA has backtracked on this, and, on the contrary, both have accepted the voluntary —not compulsory or forced— nature of union membership and union dues and fees deductions from PRASA employees.  Where the challenged measures no longer adversely affect the plaintiff's primary conduct, "injunctive relief is unavailable."  Harris v. Univ. of Mass. Lowell, 43 F.4th 187, 192 (1st Cir. 2022).  Second, declaratory relief can only survive a mootness challenge where the facts show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  Id.  The situation that plaintiff invoked to justify declaratory relief no longer exists.  Third, a claim for damages "will keep a case from becoming moot where equitable relief no longer forms the basis of a live controversy."  Thomas R.W. v. Mass. Dep't. of Ed., 130 F.3d 477, 480 (1st Cir. 1997).  But UIA requested authorization to deposit in court — and deposited— the amount corresponding to union dues and fees deducted from plaintiff's wages from the point that he resigned from UIA and until PRASA ceased collecting them, plus interest.[23]

---

[23] Plaintiff also sought nominal damages (Docket No. 1).  These are damages "awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages."  Uzuegbunam v. Preczewski, 592 U.S. ___, 141 S.Ct. 792, 800 (2021).  As such, they are "an alternative to actual damages under § 1983."  Lamberty v. Conn. State Police Union, 2018 WL 5115559, *7 (D. Conn. Oct. 19, 2018); Cortés-Reyes v. Salsas Quintana, 608 F.3d 41, 53, n. 15 (1st Cir. 2010)("[I]f a jury in a case brought pursuant to § 1983 finds a violation of the plaintiff's constitutional rights but fails to award *compensatory damages*, a plaintiff may ask the trial court for *nominal damages* on the occasion of, or immediately after, the return of the verdict")(emphasis in original).

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 35

       Nonetheless, plaintiff alleges that the case is not moot relying, among other things, on an exception to the mootness doctrine for situations in which the defendant voluntarily ceases the challenged conduct.  To this extent, he argues that PRASA and UIA can go back to their old ways and the Secretary of Justice can change the opinion upon which PRASA relied to change course (Docket Nos. 204, pp. 8-10; 205, pp. 6-7)  Where a defendant's voluntary cessation to injury-causing conduct is alleged to have mooted a case, the defendant must show that the "the allegedly wrongful behavior could not reasonably be expected to recur."  Mangual, 317 F.3d at 60.  The requirement reflects the principle "that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."  Am. Civ. Liberties Union of Mass., 705 F.3d at 54.  By extension, it serves to prevent a manipulative litigant from immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after.  Id. at 54-55.

       Still, PRASA and UIA have done more than pay lip service to plaintiff's concerns.  They changed their posture approximately 60 months ago to discontinue compulsory union membership and collection of union dues and fees from members of the bargaining unit who do not belong to the UIA and do not affirmatively consent to pay those amounts.  Since then, Puerto Rico has had three governors: Ricardo Rosselló-Nevárez, Wanda Vázquez-Garced, and Pedro Pierluisi-Urrutia; and two PRASA Executive Presidents: Eng. Elí Díaz-Atienza and Eng. Doriel Pagán-Crespo.  The succession has not resulted in a reversal of policy leading to the situation that brought plaintiff to court.  As for the Puerto Rico Secretary of Justice's Opinion, it was

---

Given that plaintiff quantified the amount of union dues and fees withheld from his wages from the point that he attempted to resign from the Union until PRASA ceased deducting them (Docket No. 82, ¶ 84), and UIA unconditionally deposited with the court that amount plus interest, the request for payment of nominal damages does not prevent dismissal on grounds of mootness.

Reynaldo Cruz
v. Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 36

issued by then Secretary Wanda Vázquez-Garced.   From that point, there have been three Secretaries of Justice in the Commonwealth: Wanda Vázquez-Garced, Dennise Longo-Quiñones and Domingo Emmanuelli.   Yet, there is no indication that the Secretary's Opinion has been qualified or repealed.[24]

In all, the case is moot.  See, LaSpina v. SEIU Pa. State Council, 985 F.3d 278, 283-284, 289 (3rd Cir. 2021)(union's acceptance of employee's resignation from union and employer's stopping deductions of union fees from employee's wages following Janus rendered moot action against union and employer for injunctive relief and refund of membership dues deducted from plaintiff's paycheck after she resigned her union membership); Branch v. Commonwealth Employment Rel. Bd., 120 N.E.3d 1163 (Mass. 2019)(challenge to state statute's agency-fee provisions rendered moot by union's cessation of agency-fee collection in response to Janus and issuance by the state attorney general and labor relations department of guidance categorically prohibiting agency-fee collection).

## IV.   CONCLUSION

For the reasons stated, the case must be dismissed.  Dismissal will be without prejudice to allow plaintiff to return to court in the event PRASA reengaged in the conduct that led plaintiff to initiate this action.

---

[24] The Secretary of Justice's opinions are not a statute, an ordinance, or a regulation, and neither are PRASA's and UIA's positions on compulsory union membership and fees deductions as a condition of employment in PRASA. Take them as policy.  But even a change in policy may render a case moot when: (1) the policy change is evidenced by language that is "broad in scope and unequivocal in tone;" (2) the policy change "fully addresses all of the objectionable measures" that government officials took against the plaintiff in the case; (3) the case in question was "the catalyst" for the agency's adoption of the new policy; (4) the policy has been in place "for a long time" when the court evaluates whether the case is moot; and (5) since the policy's implementation, the agency's officials "have not engaged in conduct similar" to that challenged by plaintiff.  Rosebrock v. Mathis, 745 F.3d 963, 972 (9th Cir. 2014).  Overall, the record satisfies these criteria.

Reynaldo Cruz
v. <u>Unión Independiente Auténtica de los Empleados
de la Autoridad de Acueductos y Alcantarillados, et al.</u>
Civil No. 17-2261 (PAD)
Memorandum and Order
Page 37

**SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of October, 2023.

<u>s/Pedro A. Delgado-Hernández</u>
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge